Henry NEUMAN, individually and d/b/a
Waterfront Management, Inc.,
Plaintiff,

v.

Russell Allen HARMON, a/k/a Rusty Harmon, James George Sonefeld, Mark William Bryan, Darius Carlos Rucker, Everett Dean Felber, each individually and collectively d/b/a Fishco, Inc., and further professionally known as Hootie & The Blowfish, and Richard Noel Gusler, Defendants.

No. 96 Civ. 3240(DC).

United States District Court,
S.D. New York.

May 23, 1997.

London & Doherty by Robert Sunshine, Steven J. London, New York City, for Plaintiff.

Selverne, Flam, & Mandelbaum, L.L.P. by Eric Vaughn Flam, New York City, for Defendants.

### AMENDED OPINION

CHIN, District Judge.

In March 1991, plaintiff and his management company sponsored a showcase for local musical talent in Rock Hill, South Carolina. The winner was to be offered a marketing contract with plaintiff, pursuant to which he would seek recording contracts on the winner's behalf. A little known band from Columbia, South Carolina, performing under the name "Hootie & the Blowfish," competed in the showcase and won. As a result, plaintiff entered into a marketing contract with the band and then later a management contract as well. Both agreements provided for plaintiff to receive a percentage of the band's earnings. Hootie & the Blowfish, of course, eventually became a huge success, selling millions of records.

Plaintiff and the band, however, had a falling out. They executed a "Mutual Release" in February 1995, terminating their relationship. The effect of that release is one of the central disputes in the case.

Plaintiff commenced this lawsuit in May 1996, alleging breach of contract, breach of fiduciary duties, fraud and misrepresentation, and seeking $50 million in compensatory damages and $100 million in punitive damages.

This is the fourth proceeding to be filed in connection with the dispute between the parties. Plaintiff commenced arbitration proceedings against defendants in New York in July 1995; defendants brought an Article 75 proceeding against plaintiff in state court in New York in August 1995 seeking to vacate the arbitration demand; and defendants brought a declaratory judgment action against plaintiff in state court in South Carolina in February 1996.

Defendants move to dismiss the instant complaint pursuant to Fed.R.Civ.P. 12(b)(6), contending that plaintiff's claims are barred both by the doctrine of res judicata and the terms of the Mutual Release. Alternatively, defendants ask this Court to abstain from exercising jurisdiction over this case pending resolution of the state court proceedings in South Carolina.

Res judicata is not a bar to plaintiff's claims, however, for the validity of the Mutual Release has not been adjudicated. Moreover, factual issues exist as to the meaning and enforceability of the Mutual Release. In addition, a federal court should abstain from hearing a case only in "exceptional circumstances," and the circumstances in this case are not exceptional.

Accordingly, defendants' motion is denied in all respects.

### BACKGROUND

#### A. The Parties

Plaintiff Henry Neuman ("Neuman") is a personal manager of performing artists. He does business through his management firm, Waterfront Management, Inc. ("Waterfront Management"), which has its offices in New York City.

Defendants are Hootie & the Blowfish (collectively, "Hootie"); its members, Darius Carlos Rucker (lead vocalist and guitarist), James George Sonefeld (drummer and vocalist), Mark William Bryan (guitarist and vocalist), Everett Dean Felber (bass guitarist and vocalist), and Russell Allen Harmon ("Harmon") (non-performing member); their attorney, Richard Noel Gusler ("Gusler"); and Fishco, Inc., a corporation through which Hootie's members transact business.

#### B. The Facts

After Hootie's victory in Neuman's showcase, the parties executed a marketing contract (the "Marketing Agreement") on May 24, 1991, granting plaintiff (1) the exclusive right for an initial six month period to pursue a recording contract on behalf of Hootie and (2) 15 percent of all funds and royalties under any recording agreement signed with a major recording company during the term of the contract. (Amend.Compl.Ex. A).

On November 1, 1991, Hootie hired Neuman as the band's manager and executed a management contract (the "Management Contract"). Under the Management Contract, Neuman was to be the band's exclusive personal manager for a three-year term (beginning on September 13, 1991). (Amend. Compl.Ex. C, ¶ C). Neuman also was to receive 15 percent of all "Gross Monies" that Hootie "derived from the entertainment industry," including "employment or contracts or agreements for employment ... entered into or substantially negotiated" during the term of the Management Contract. (*Id.* ¶ 4). Disputes arising under the Management Contract were to be submitted to arbitration. (*Id.* ¶ 8).

These two contracts lie at the heart of this dispute, as plaintiff contends that defendants owe him money under both the Marketing Agreement and the Management Contract. Plaintiff alleges that in the summer of 1992 Hootie acknowledged the debt but asked plaintiff to defer payment so that the money could be used for recording expenses. (*Id.* ¶ 65). Plaintiff agreed, and as a result, in November 1992 the band produced its "Kootchypop" recording. (*Id.* ¶¶ 67–69). Hootie

self-distributed this recording in South Carolina, with a liner note entry that allegedly improperly identified Rusty Harmon as the band's manager. (*Id.* ¶ 72).

In October 1993, Hootie's legal counsel Richard Gusler asked plaintiff to sign a "Mutual Release From Management Contract," but plaintiff refused. (*Id.* ¶ 90; Ex. D).

In July 1994, Hootie released "Cracked Rear View" under a recording contract signed with Atlantic Records in December 1993—allegedly without plaintiff's prior knowledge. This album has sold over 14 million copies to date and is the second largest selling debut album in the history of the music industry.[1]

In July 1994, plaintiff attempted to contact Hootie and Gusler to demand payment of commissions he believed were due him. (*Id.* ¶¶ 103–05). In January 1995, defendants Gusler and Harmon arranged to meet plaintiff in New York on February 9, 1995 to discuss the Mutual Release. (*Id.* ¶¶ 106, 110). According to plaintiff, at that meeting, defendants Gusler and Harmon acknowledged that the Management Contract was still in effect, but threatened not to pay plaintiff any money owed to him unless he executed the Mutual Release. (*Id.* ¶ 111). Plaintiff contends that defendants orally assured him that if he signed the Mutual Release (1) he would be paid all commissions due under the Marketing Agreement and the Management Contract and (2) he would be provided a position at Fishco, Inc. (*Id.* ¶¶ 112, 113). Plaintiff also alleges that defendants told him that the language of the Mutual Release was intended only to create prospective termination of the Management Contract. (*Id.* ¶¶ 118–19). Plaintiff then executed the Mutual Release.

### C. *Prior Proceedings*

Because defendants purportedly failed to comply with the oral assurances they gave plaintiff, in accordance with the arbitration provisions of the Management Contract,

plaintiff filed a demand for arbitration with the American Arbitration Association in New York on July 5, 1995, seeking 15 percent of the gross monies earned by Hootie from November 1991 to February 1995. Defendants then commenced an Article 75 proceeding in the Supreme Court of the State of New York on August 9, 1995 to vacate Neuman's arbitration demand and to stay the arbitration. On December 19, 1995, Justice Edward H. Lehner granted Hootie's motion to stay the arbitration, holding that the Mutual Release terminated the arbitration provision in the Management Contract. (Def.Ex. 7). In so holding, he noted that,

> Respondent [Neuman] has not in any manner contested the validity of the release and termination, nor asserted that it is in any manner ambiguous or unclear, nor the result of any improper action on the part of the petitioners.

(Def. Ex. 7 at 1–3).

On February 22, 1996, Hootie commenced a declaratory judgment action against plaintiff in South Carolina seeking a declaration that the Mutual Release was valid and enforceable. Neuman raised the defenses of improper service of process and lack of personal jurisdiction. The parties then agreed, on May 22, 1996, to a Consent Order staying the proceeding, preserving all defenses and objections by the parties, pending a final decision on the Article 75 proceeding in New York.

In the meantime, Plaintiff filed this action on May 3, 1996. In his amended complaint, plaintiff alleges six causes of action: (1) breach of the Marketing Agreement; (2) breach of the Management Contract; (3) breach of fiduciary duty; (4) fraudulent misrepresentation; (5) fraudulent inducement; and (6) negligent misrepresentation.

In September 1996, defendants filed the instant motion, to dismiss the amended complaint or, in the alternative, for this Court to abstain pending the South Carolina state court proceeding.

---

**1.** Cracked Rear View shares this honor with the Guns N' Roses recording "Appetite for Destruction." Each group sold 13 million albums. "The 25 Best–Selling Albums of All–Time," *Entertainment Wkly.*, May 3, 1996.

The question that comes to mind, of course, is which album is the best-selling debut album of all time. For the answer, *see infra* note 7.

On March 25, 1997, Justice Lehner's decision was affirmed by the Appellate Division, First Department. *Bryan v. Newman,* —— A.D.2d ——, 655 N.Y.S.2d 930 (1st Dep't 1997).

## DISCUSSION

Defendants' motion raises three issues: (a) whether the doctrine of *res judicata* bars this case because Justice Lehner purportedly held that the Mutual Release was valid in granting the Article 75 petition to stay the arbitration proceedings; (b) whether, even assuming the validity of the Mutual Release was not adjudicated by Justice Lehner, the clear language of the Mutual Release bars this action as a matter of law; and (c) whether, under *Colorado River Water Conser. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), this Court should abstain in deference to the South Carolina state court proceedings.

### A. *Res Judicata*

Plaintiff argues that the Mutual Release is not valid because his signature was obtained by fraud. Hootie contends that plaintiff's claims as to the validity of the Mutual Release are barred by the doctrine of *res judicata* because plaintiff had the opportunity to raise such claims in his challenge to the Mutual Release in the Article 75 proceeding but failed to do so.

Under the doctrine of *res judicata,* "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 265 (2d Cir. 1997) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994)). The Full Faith and Credit Clause of the Constitution requires that federal courts give state court judgments "the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Id.* (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984)). Thus, to determine whether plaintiff's claims are precluded, this Court must look to New York law.

New York courts have adopted the transactional approach to the doctrine of *res judicata,* which bars "a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Burgos,* 14 F.3d at 790 (citations omitted). In addition, the prior judgment must constitute a final judgment "on the merits." *641 Avenue of the Americas Ltd. Partnership v. 641 Assocs., Ltd.,* 189 B.R. 583, 588 (S.D.N.Y.1995). *Res judicata* does not apply, however, where "the initial forum did not have the power to award the full measure of relief sought in the latter litigation" or " 'formal jurisdictional or statutory barriers' prevented [the plaintiff] from presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law.' " *Jacobson,* 111 F.3d 261, 265 (citing *Burgos,* 14 F.3d at 790 (internal quotations omitted)).

In general, Article 75 proceedings (to stay or compel arbitration) are given preclusive effect by federal courts. *Sewell v. New York City Transit Auth.,* 809 F.Supp. 208, 213 (E.D.N.Y.1992). As neither party disputes that the Article 75 decision constitutes a "final judgment," the only issues are (1) whether there was a judgment "on the merits" and (2) whether this case involves issues that were or could have been litigated in the Article 75 proceeding.

Plaintiff argues that there was no decision "on the merits" in the Article 75 proceeding because Justice Lehner did not consider the "merits" of Neuman's contract and fraud claims. (Pl. Am. Mem. in Opp. to Mot. to Dismiss at 35). Defendants respond that the Article 75 decision was on the "merits" with respect to the issue of the validity of the Mutual Release. Defendants contend that to reach his decision that the Mutual Release was valid, Justice Lehner considered—and rejected—plaintiff's fraud claims, citing the portion of his opinion that concluded that Neuman had "not in any manner contested the validity of the release and termination, nor asserted that it is in any manner ambiguous or unclear." (Def. Ex. 7 at 1–3).

Justice Lehner's decision makes it clear that he did not believe that Neuman had attacked the validity of the Mutual Release. Likewise, a review of Neuman's opposition papers in the Article 75 proceeding shows that he did not attack the validity of the release. Hence, Justice Lehner did not reach the issue. Moreover, even assuming that Neuman had attacked the validity of the Mutual Release, Justice Lehner was of the view that he did not have the power—in the context of the Article 75 proceeding—to consider the issue. As Justice Lehner noted, "questions as to coercion and fraud in obtaining a termination agreement [*i.e.*, an agreement terminating or cancelling an agreement to arbitrate] would be for the arbitrator." (*Id.* at 3) (citing *Schlaifer v. Sedlow*, 51 N.Y.2d 181, 184 n. 1, 433 N.Y.S.2d 67, 412 N.E.2d 1294 (1980) ("it may be that" whether cancellation agreement was induced by coercion or fraud is question for the arbitrator)); *but see In re Minkin*, 279 A.D. 226, 108 N.Y.S.2d 945, 949 (2d Dep't 1951) (suggesting that cancellation agreement may be set aside for coercion or duress only in an "action in equity brought for that purpose"), *aff'd*, 304 N.Y. 617, 107 N.E.2d 94 (N.Y.1952); *Rochdale Village, Inc. v. Public Serv. Employees Union, Local No. 80*, 605 F.2d 1290, 1295–96 (2d Cir.1979) (whether termination of arbitration agreement is an issue for the court or for arbitrators will depend on scope of arbitration clause and circumstances of termination). It would appear, from the language in his decision, that had Neuman raised the issue of fraud in the inducement with respect to the Mutual Release, Justice Lehner would have denied the petition to vacate the arbitration demand, for the issue of the validity of the Mutual Release would have been—in his view—an issue for arbitration.

■ It would appear then that Neuman arguably was entitled to have an arbitrator decide the issue of the validity of the Mutual Release.[2] Having failed to raise the issue before Judge Lehner, however, Neuman must be deemed to have waived his right to arbitrate that issue.

■ The question remains as to whether the doctrine of *res judicata* bars Neuman from now claiming that he was induced into executing the Mutual Release by fraud and misrepresentation. I hold that it does not. The issue of the validity of the Mutual Release was not actually litigated before Justice Lehner, nor, in Justice Lehner's view, could it have been. If the issue had been raised, Justice Lehner would have held that it was an issue for arbitration.[3]

■ Likewise, plaintiff's claims on the merits are not barred by the doctrine of *res judicata* because these claims could not have been litigated in the Article 75 proceeding. The scope of the Article 75 proceeding was limited to determining whether the Mutual Release, which Justice Lehner essentially assumed to be valid, terminated the parties' obligation to arbitrate. Justice Lehner did not consider, and could not have considered, the merits of plaintiff's underlying claims. See C.P.L.R. § 7501 (in determining the validity of an arbitration agreement, "the court shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute").

Accordingly, the *res judicata* defense is rejected.

## B. *The Effect of the Mutual Release*

■ Defendants argue that the language of the Mutual Release terminated the obligations of both parties under the Marketing Agreement and Management Contract.

2. If the arbitrator had held that the Mutual Release was valid, then to the extent Neuman had a claim at all, he would have had to pursue it in court rather than through arbitration.

3. Defendants also appear to argue that the doctrine of collateral estoppel bars plaintiff's fraud claims. The doctrine of collateral estoppel precludes a party from relitigating an issue of fact or law that has been previously litigated and decided in a prior proceeding, if the party had a full and fair opportunity to litigate the issue in the prior proceeding and resolution of that issue was necessary to support a valid and final judgment on the merits. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992). As discussed, the fraud issues were not previously litigated and decided in the Article 75 proceeding and thus, the doctrine of collateral estoppel does not bar their litigation in this case.

(Def. Mem. in Supp. Mot. to Dismiss at 11). Plaintiff responds that the Mutual Release does not bar the claims because (1) ambiguities exist in the language of the Mutual Release, (2) defendants' intention in executing the Mutual Release was only to eliminate any prospective obligations to perform under the contracts, and (3) the Mutual Release is void in any event because plaintiff was induced into signing it by fraud.

Under New York law, the general law of contract applies in interpreting a release. *Cahill v. Regan*, 5 N.Y.2d 292, 184 N.Y.S.2d 348, 354, 157 N.E.2d 505 (1959). It is well settled that New York law requires that "a release contain 'an explicit, unequivocal statement of a present promise to release defendant from liability.'" *Bank of America National Trust and Savings Assn. v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir.1985) (citations omitted). The words must manifest the releasor's intent to discharge and the dispositive element in determining the scope of a release is the parties' intent. *Id.; Albany Savings Bank v. Halpin*, 918 F.Supp. 553, 557 (N.D.N.Y.1996) (the intent of the parties "governs the scope of a release").

The Mutual Release in this case is not clear and unequivocal. It states in pertinent part:

> That ARTIST, being signatorys [sic] to the above referenced agreement, wish to terminate this management contract, and in so doing release MANAGER from any further responsibilities to ARTIST thereunder.
>
> That MANAGER, being a signatory to the above referenced agreement wishes to ter-

minate this management contract, and in so doing agrees to release ARTIST from any further responsibility to MANAGER under the above referenced agreement.

> THEREFORE, ARTIST and MANAGER do hereby release each other from any and all responsibilities and liabilities under the above mentioned contract dated November 1, 1991.

(Amend.Compl., Ex. D).

Drawing all inferences in favor of the plaintiff as required in considering this motion,[4] there is some ambiguity in the language. It is not clear on the face of the Mutual Release that the parties intended to release each other from all liabilities. While the third paragraph does refer to "any and all responsibilities and liabilities" under the Management Contract, the first two paragraphs refer only to releasing the parties "from any *further* responsibilities." (Emphasis added). Hence, plaintiff may reasonably argue that, read as a whole, the Mutual Release released the parties only further responsibilities and liabilities, that is, responsibilities and liabilities going forward.

Plaintiff also contends that the parties intended for the Mutual Release to apply only to "prospective relationships," and not to terminate obligations or liabilities already incurred before February 9, 1995. (Pl. Mem. in Opp. to Mot. to Dismiss at 31). Plaintiff further contends that defendants made fraudulent statements that induced him into executing the Mutual Release. There may be other facts that bear on these issues, such as what, if any, compensation was paid to

---

**4.** In deciding this motion to dismiss, the Court must view the amended complaint in the light most favorable to plaintiff and accept all allegations contained in the amended complaint as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Annis v. County of Westchester*, 36 F.3d 251, 253 (2d Cir.1994). Giving plaintiff the benefit of the inferences in his favor, the amended complaint should not be dismissed unless it appears beyond a doubt that he can prove no set of facts that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Christ Gatzonis Elec. Contractor, Inc. v. New York City School Constr. Auth.*, 23 F.3d 636, 639 (2d Cir.1994).

Plaintiff alleges that this Court should convert this motion to a motion for summary judgment because defendants rely on the decisions in the state court proceedings to support their affirmative defenses of release and *res judicata*. (Pl. Mem. in Opp. at 19). I have taken judicial notice of these decisions, however, and therefore do not need to convert this motion to one for summary judgment. *Lipin v. American National Red Cross*, Nos. 93 Civ. 1334, 92 Civ. 4455, 1996 WL 18901, at *27 (S.D.N.Y.1996) (deciding that state court action had preclusive effect, court held that a "federal court may consider records in prior judicial proceedings when determining a 12(b)(6) motion to dismiss, without the necessity of converting the motion to one for summary judgment").

plaintiff and what was said to him by certain of the defendants.

Accepting plaintiff's allegations as true for purposes of this motion, plaintiff has alleged facts under which his claim could prevail. Therefore, defendants' motion in this respect must be denied.[5]

### C. *Colorado River Abstention*

██ Finally, defendants contend that this Court should abstain from deciding this case under *Colorado River Water Conser. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), because there is an action pending in the state court in South Carolina.[6] Under *Colorado River,* a federal court may abstain in limited situations where there are parallel state and federal actions.

It is well settled that federal courts have a "virtually unflagging obligation" to exercise their jurisdiction. *Burnett v. Physician's Online, Inc.,* 99 F.3d 72, 76 (2d Cir.1996) (quoting *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246). As a result, abstention under *Colorado River* is "an extraordinary and narrow exception" to the district court's duty to adjudicate the controversy before it, and should only be employed in "exceptional circumstances." *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244. The party seeking a stay under *Colorado River* must overcome a "heavy presumption favoring the exercise of jurisdiction." *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.,* 800 F.2d 325, 327 (2d Cir.1986).

██ Whether to stay the federal suit under *Colorado River* is within the district court's discretion. *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 12, 103 S.Ct. 927, 935, 74 L.Ed.2d 765 (1983). To determine whether abstention is appropriate, a court must weigh six factors "with the 'balance heavily weighted in favor of the exercise of jurisdiction.'" *Burnett,* 99 F.3d at 76 (citing *Moses H. Cone,* 460 U.S. at 16, 103 S.Ct. at 937). These factors are: (1) assumption by federal or state court of jurisdiction over any res or property; (2) whether the federal forum is any less convenient to the parties than the state forum; (3) whether there is a danger of piecemeal litigation; (4) the order of the two suits; (5) whether federal law provides the rule of decision on the merits; and (6) whether the state court is able to adequately protect the plaintiff's rights. *Burnett,* 99 F.3d at 76.

Applying these factors, I find that abstention is inappropriate here. First, the parties agree that the first factor, the existence of a res or property, is not applicable in this case.

Second, the federal forum in New York is not less convenient than the state court in South Carolina. Defendants are alleged to reside in South Carolina, but plaintiff is alleged to reside in New York. Moreover, the Mutual Release was executed in New York, and it does not appear that any of the agreements or documents were executed in South Carolina.

Third, there is some risk of piecemeal litigation if this federal suit proceeds. The South Carolina state case was held in abeyance pending a final decision in the Article 75 proceeding. Since a final decision has now been rendered, presumably the South Carolina case will proceed. But first Neuman's jurisdictional defenses must be decided. Moreover, since the South Carolina case is apparently just a declaratory judgment action, the two cases are not identical. Presumably, however, if Neuman's jurisdictional defenses are rejected, he will assert counterclaims for damages. Nonetheless, it does not make sense for the parties to litigate the case in both courts.

---

5. Moreover, the full title of the Mutual Release is "Mutual Release from Management Contract," and it makes specific reference to the Management Contract only and make no reference to the Marketing Agreement. Hence, *even assuming* the Mutual Release does bar any and all claims based on the Management Contract, it could be reasonably construed as not barring plaintiff's claims for damages based on the Marketing Agreement.

6. Originally, defendants also argued that abstention was required because there was an appeal pending before the Appellate Division of the New York Supreme Court, First Department. That court, however, rendered a decision on March 25, 1997, affirming Justice Lehner's decision in the Article 75 proceeding to stay arbitration.

Fourth, the South Carolina suit was filed some two and a half months before the instant case was filed. Again, however, the South Carolina suit has been stayed by mutual agreement of the parties, by a consent order apparently entered into after the present case was filed. (*See* Consent Order, Def. Ex. 11). Hence, that the federal suit was commenced later does not weigh in favor of abstention, as the state court suit has not proceeded significantly further than this federal suit.

Fifth, since this is a diversity case, federal law does not provide the rule of decision on the merits. Nor, however, does the law of South Carolina. The Mutual Release was apparently executed in New York; the Marketing Agreement was apparently executed in North Carolina; and the Management Contract was apparently executed in California and it contains a choice of law clause providing for the application of California law. Hence, the South Carolina court is in no better position to apply state law than is this Court.

Finally, there is no reason to believe that the South Carolina state court would not adequately protect plaintiff's rights. Hence, this factor weighs in favor of abstention.

On the whole, however, this case does not present the "exceptional circumstances" required for a district court to abdicate its responsibility to adjudicating a controversy properly before it. *See Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244. Although some of the factors weigh slightly in favor of abstention, defendants have failed to overcome the "heavy presumption favoring the exercise of jurisdiction." *Bethlehem Contracting*, 800 F.2d at 327. Accordingly, I will not abstain.

### CONCLUSION

For the reasons set forth above, Hootie's motion to dismiss the complaint or, alternatively, for this Court to abstain is denied.[7] Counsel for the parties are to appear for a pretrial conference on June 13, 1997 at 11 a.m. in Courtroom 11A of the United States Courthouse at 500 Pearl Street.

SO ORDERED.

---

7. The biggest selling debut album ever is "Boston" by the group Boston at 15 million albums.

"The 25 Best–Selling Albums of All Time," *Entertainment Wkly.*, May 3, 1996.